UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

ROY USHER,

                                                    **MEMORANDUM & ORDER**

                                                    **06-cv-1126**


                              Petitioner,


              -against-


  ROBERT ERCOLE, Superintendent, Green
  Haven Correctional Facility,


                              Respondent.
-------------------------------------------------------------------X
NICHOLAS G. GARAUFIS, United States District Judge.

        Petitioner Roy Usher ("Usher") brings a petition for a writ of habeas corpus pursuant to

28 U.S.C. § 2254, challenging his 2001 conviction in New York State Supreme Court, Kings

County, for Course Of Sexual Conduct Against A Child in the first degree. Usher challenges the

conviction on the ground that his trial counsel provided constitutionally ineffective assistance.

Specifically, Usher asserts that his trial counsel (1) failed to challenge the only physical evidence

of sexual contact between the defendant and the complainant by, inter alia, failing to consult or

call an expert witness to rebut claims made by the prosecution's expert witness; (2) introduced

medical records into evidence that were otherwise inadmissible and bolstered the testimony and

credibility of the alleged victim; (3) cured a defect in the prosecution's case by introducing

evidence that established an element of the crime; and (4) needlessly elicited damaging "outcry"

testimony from a prosecution witness, which opened the door for the prosecution to elicit

additional damaging testimony.

        It is clear from the state-court record and defense counsel's testimony that counsel's

actions fell outside the range of professionally competent assistance, and that that the outcome of

Usher's trial may well have been different but for counsel's errors. These errors deprived Usher of his Sixth Amendment right to effective assistance of counsel, and the New York State court's contrary conclusion was an unreasonable application of controlling Supreme Court law. The court therefore grants Usher's petition for a writ of habeas corpus.

## I. FACTS AND PROCEDURAL HISTORY

In January 2001, Usher was indicted in Kings County and charged with one count each of Course of Sexual Conduct Against a Child in the First Degree, N.Y. Penal Law § 130.75(1)(a), Course of Sexual Conduct Against a Child in the Second Degree, N.Y. Penal Law § 130.80(1)(a), and Endangering the Welfare of a Child, N.Y. Penal Law § 260.10(1). (Indictment (Docket Entry # 25, Ex. 1) 1-3.) The indictment charged Usher with sexually abusing four-year-old Fatima Reed ("Fatima"), the daughter of his live-in girlfriend, during the period from July 25 through November 17, 2000. (Id. at 1.)

### A. Pretrial Proceedings

Before voir dire, the prosecution moved in limine to permit testimony from Fatima's mother, Lugenia Reed, about a "prompt outcry" that Fatima allegedly made to her mother on November 17, 2000.[1] According to the prosecution's offer of proof, Lugenia Reed would testify that Fatima spent the weekend with her godmother and that, upon returning to the apartment where Lugenia Reed and Usher lived, Fatima became hysterical and stated that Usher had touched her vagina. (Id. at 69-70.) The prosecution also stated that Lugenia Reed would testify that Fatima repeated this accusation in front of Usher. (Id. at 70-71.) Defense counsel objected only that the proposed testimony was "prejudicial and not relevant." (Id. at 71.) The court ruled:

---

[1] Under New York State law, "evidence that a victim of sexual assault promptly complained about the incident is admissible to corroborate the allegation that an assault took place." People v. McDaniel, 81 N.Y.2d 10, 16 (N.Y. 1993). For such evidence to be admissible, "the complaint must have been made promptly after the crime, and . . . only the fact of a complaint, not its accompanying details, may be elicited." Id. at 17.

I would permit the words of the child limited to the four or five or six words . . . the child said.  With respect to the second confrontation with the defendant, I believe that this is within the parameters of an appropriate outcry . . . .  [B]ut again it's not to be repeated in terms of details . . . with respect to both instances of what the child said.  The jury will be instructed that this is hearsay.  It's being offered for the fact that the statements were made, but not the truth of the statements.

(Id. at 71-72.)

**B.      The Trial**

At trial, the prosecution called four witnesses: (1) Fatima's godmother, Marilyn Laguerre ("Laguerre"); (2) Fatima; (3) Dr. Donald J. Lewittes ("Dr. Lewittes"), a clinical psychologist who testified as an expert on children's psychological reactions to sexual abuse; and (4) Dr. Flora Ramirez ("Dr. Ramirez"), a pediatric medical expert who examined Fatima after the revelation of the alleged abuse.  The defense did not make an opening statement, called no witnesses, and did not put on a case.

1.      <u>Marilyn Laguerre's Testimony</u>

On direct examination, Fatima's godmother Marilyn Laguerre testified as follows.  Fatima was born on July 25, 1996.  (Trial Transcript (Docket Entry # 7) ("TT") 433.)  In 2000, when Fatima was four years old, she lived in a Brooklyn apartment with her mother, Lugenia Reed; Lugenia Reed's boyfriend, Roy Usher; and Fatima's younger brother Malik Reed, who is the son of Lugenia Reed and Usher.  (Id. at 433-34, 455, 473.)  Laguerre was the director of a local preschool program that Fatima attended.  (Id. at 435-36.)  Laguerre testified that when Fatima's aunt or uncle came to pick Fatima up from school, she would appear excited and happy, but that when Usher came to pick Fatima up she "did not want to go" home with him and would become withdrawn and angry and occasionally yell or cry.  (Id. at 436-38.)

On the evening of November 17, 2000, Laguerre picked Fatima up from Fatima's great-grandmother's house and drove her back to the apartment that Usher and Lugenia Reed shared. (Id. at 439-40.) When they arrived at the apartment, Fatima began to cry and refused to go upstairs to the apartment. (Id. at 440.) Laguerre left Fatima on the street with Lugenia Reed and Lugenia's cousin, Kenneth Washington. (Id. at 441.) Later that night, Laguerre received a phone call from Lugenia Reed that prompted Laguerre to go to a protective services agency, where she and Fatima met with a detective from the Brooklyn Child Abuse Squad. (Id. at 442-44.) When Laguerre began to describe the contents of the phone call, the court instructed her not to tell the jury what Lugenia Reed had said; instead, Laguerre testified only that the conversation had been about Fatima and Usher. (Id. at 444.)

Because Lugenia Reed had a drug habit, Laguerre obtained legal custody of Fatima in December 2000. (Id. at 434, 476.) While living with Laguerre, Fatima suffered from night terrors, was afraid to go to bed, cried and screamed before going to sleep, and woke up "screaming and hollering" every night. (Id. at 446-47.) According to Laguerre, Fatima was "afraid of Roy." (Id. at 447.) In January 2001, Fatima began attending weekly counseling sessions. (Id. at 450.)

On cross-examination, defense counsel asked Laguerre a series of confusing questions about the timing of various actions that she and Lugenia Reed had taken. (Id. at 451-56.) At one point, defense counsel asked Laguerre when Fatima first told her that Usher had "touched her in an inappropriate manner," to which Laguerre responded, "[T]he night of November 17." (Id. at 452.)

Defense counsel also questioned Laguerre about Dr. Ramirez's examination of Fatima on January 4, 2001. Defense counsel asked a series of detailed questions about Fatima's medical

history, particularly whether Fatima had a history of vaginal infection or trauma. (Id. at 456-57.)

It is clear from the transcript that these questions were drawn from Dr. Ramirez's written record

of the examination. (Compare id. with Child Sexual Abuse Examination Report dated January 4,

2001 and signed by Flora Ramirez, M.D. (Docket Entry # 1, Att. # 1 Ex. B (§ 440 Motion Ex.

C)) ("Ramirez Report") at 10.) This questioning resulted in two sustained objections and a side-

bar.

Following the side-bar, defense counsel moved all of Fatima's medical records, including

the Ramirez Report, into evidence.[2] (See TT 457-58; Medical Records (Docket Entry # 25, Ex.

3).) This record included, inter alia, five pages of notes from Dr. Ramirez's interview of Fatima

and Lugenia Reed, including Fatima's detailed narrative of the alleged abuse and Lugenia's

description of how and when Fatima told her about the abuse; drawings of a pre-school-aged

female child that Fatima had used to identify body parts and describe how Usher had allegedly

touched her, with accompanying notations describing the allegations in Fatima's words;

completed personal and medical history questionnaires; details of Dr. Ramirez's physical

examination of Fatima's vaginal and rectal areas; and a summary of Dr. Ramirez's findings,

including her conclusion that Fatima's vagina exhibited abnormalities consistent with chronic

penetration. (See Medical Records.)

Defense counsel made little use of the medical records after entering them into evidence.

He initially attempted to discern whether Laguerre, as opposed to Fatima, had told Dr. Ramirez

that Fatima did not have any vaginal bleeding. This effort was hampered by numerous sustained

objections. (TT 459-62.) After establishing that Laguerre had not told Dr. Ramirez about the

absence of vaginal bleeding, defense counsel abandoned further reference to the medical records

---

[2] The Ramirez Report is one portion of the larger batch of Fatima's medical records that counsel moved into evidence. (See Letter from Petitioner's Counsel dated April 30, 2010 (Docket Entry # 25).)

on cross-examination.  Counsel returned to the Ramirez Report only once, to clarify that Fatima's statement in the interview notes that Usher "burnt" her did not refer to the literal act of burning her with a heated object.  (TT 467.)

Defense counsel also questioned Laguerre again about the details of Fatima's initial "outcry."  (Id. at 469-71.)  Laguerre testified that Fatima first told Laguerre that Usher had abused her on the evening of November 17, 2000, and that both Fatima and Lugenia Reed spoke to Laguerre on the phone that night.  (Id.)

On re-direct examination, the prosecution immediately asked Laguerre "what exactly" Fatima had told her on the phone.[3]  (Id. at 474.)  The prosecution elicited several details about the conversation, including that Fatima stated that Usher "touched her on her cooty" and put his "peanuts" in her "cooty," her "butt," and her mouth.  (Id. at 475.)  Laguerre testified that Fatima generally referred to the male sexual organs as "peanuts" and to her vagina as her "cooty."  (Id. at 474, 475.)

The prosecution also asked numerous questions about allegations that Fatima made to Laguerre at other times – i.e., subsequent to and apart from the November 17 phone call.  (Id. at 474-76.)  The prosecution elicited that, at some unspecified time, Fatima told Laguerre about a game that she and Usher had played called "mommy and daddy," in which Usher would give Fatima a "mommy daddy kiss" by putting his tongue in her mouth, after which he would "put his penis in her."  (Id.)  Defense counsel did not object to any of this testimony.  Once Laguerre began to testify about Usher's use of Vaseline, which she said Fatima called "grease," the court interrupted her testimony and called both counsel forward for a bench conference.  (Id. at 475.)

---

[3] Defense counsel's general objection to this question was overruled.  (TT 474.)

Following the bench conference, the prosecution ceased asking Laguerre about Fatima's allegations. (Id.)

On re-cross examination, defense counsel again returned to the topic of the November 17 phone call. He asked whether Fatima had told Laguerre "that Usher put his penis in her." (Id. at 480.) Laguerre responded affirmatively. (Id.) Defense counsel, either citing or reading from the Ramirez Report, also elicited that Fatima had met a number of the developmental landmarks that would be expected from a child her age. (Id. at 484-87.)

After Laguerre finished testifying, the court stated outside the presence of the jury that it had "frankly expected" the outcry testimony to come from Lugenia Reed, rather than Laguerre. (Id. at 513.) The court declared that although "there were no objections that would call for the explanation to the jury at that time that this was hearsay," the court would nonetheless issue a limiting instruction to the jury. (Id.) The next day, the court instructed the jury as follows:

> [Y]ou did hear yesterday testimony through the witness Marilyn Laguerre regarding a telephone conversation that she had with the child Fatima Reed. Now that testimony was hearsay. That is the statements of Fatima Reed, through Miss Laguerre, is what is called hearsay. I permitted that testimony to be elicited only for the purpose of establishing, if you accept such testimony, that such statements were true. Excuse me. I retract that. That such statements were made but not for the truth of the statement. In other words, you may not consider the statements that were testified to by Miss Laguerre as true. You may consider them only in light of the testimony that the statements were made.

(Id. at 517-18.)

Contrary to its earlier representations, the prosecution did not call Lugenia Reed as a witness.

2.      Fatima Reed's Testimony

On direct examination, Fatima testified that her birthday was on July 25, that she turned

four years old in the summer of 2000, and that she was attending preschool at the time.  (Id. at

526, 527.)  She did not remember her fourth birthday party.  (Id. at 527.)

Fatima testified that when Usher picked her up from school, he would take her home and

touch her.  (Id. at 528-29.)   When asked to name the part of her body that Usher touched, Fatima

said, "Vagina."  (Id. at 529.)  After a clarifying question from the prosecution, Fatima stated that

she used to call her vagina her "cooty," and that Usher had touched her "cooty" with his

"peanuts."  (Id.)  Fatima identified what "peanuts" were by pointing to her vaginal area.  (Id.)

Fatima further testified that Usher placed his "peanuts" insider her "cooty;" that he touched her

"cooty" and the "inside" of her "butt" with his hands; that he made Fatima get hair gel from her

mother's bag in the bathroom and put it on his "peanuts"; and that Usher would kiss Fatima on

the mouth and move his tongue inside her mouth.  (Id. at 530-35.)  Fatima did not testify when

this conduct began or ended.

Fatima also testified about two specific incidents of alleged abuse.  At an unspecified

point in time, Usher forced Fatima to perform fellatio inside an elevator.  (Id. at 533.)  Fatima

also testified that on a different occasion Usher picked her up from school before a Halloween

party, at which point he took her home and had sexual intercourse with her.  (Id. at 535-37.)

Defense counsel opened cross-examination by asking Fatima if Usher "broke the elevator

by putting his penis in your mouth," to which Fatima answered yes.  (Id. at 540.)   Following a

sustained objection to a similar question, defense counsel asked Fatima when she had been in the

elevator with Usher.  (Id.)  Fatima responded, "Last week."  (Id.)  She repeated this answer

several times.  (Id. at 541-42.)  Defense counsel then asked Fatima when Usher first began

touching her, despite the fact that Fatima had not testified to that issue on direct examination.
(Id. at 542.)  Fatima again answered, "Last week."  (Id.)  Defense counsel asked Fatima if Usher
had touched her "a year ago," and when Fatima said yes, defense counsel attempted to ascertain
the exact date that Usher first touched her.  (Id. at 543.)  This inquiry prompted the following
colloquy:

| | |
|---|---|
| DEFENSE: | . . . .  What was the date he touched you a year ago? |
| COURT: | Fatima. |
| DEFENSE: | If she remembers. |
| COURT: | Do you understand the question you're being asked?  Mr. Harrison asked you how long ago it was that Roy started touching you and I think you said a year.  Was that right? |
| FATIMA: | Yes. |
| COURT: | Now he wants to know do you know what date is [sic].  You said your birthday. |
| FATIMA: | July. |
| COURT: | July what. |
| FATIMA: | July. |
| COURT: | What is your birth date. |
| FATIMA: | July 25. |
| COURT: | Right. That's a date.  Were you able to say the first time when he touched you by a date like that. |
| FATIMA: | Yes. |
| COURT: | You are.  All right.  If you are able to answer it, you tell him the first time it happened. |
| FATIMA: | July. |
| COURT: | Go on. |
| FATIMA: | July. |
| COURT: | Is that as close as you can get that it was July. |
| FATIMA: | Yes. |
| COURT: | All right.  Go ahead. |
| DEFENSE: | Now, when did you tell – when did you tell your mommy about this? |
| FATIMA: | In June. |

(Id. at 544-45.)

### 3. Dr. Donald Lewittes's Testimony

Dr. Donald Lewittes testified as an expert on children's psychological reactions to sexual abuse. In particular, Dr. Lewittes testified about Child Sexual Abuse Accommodation Syndrome, which he defined as a five-stage set of symptoms or reactions typically exhibited by sexually abused children. (Id. at 562-68.) These stages are engagement, sexual interaction, secrecy, delayed disclosure, and suppression. (Id.) Dr. Lewittes opined that a preschool-aged child who has been sexually abused by a family member may not disclose the abuse for a significant period of time due to intimidation, fear, and an inability to process and verbalize the distress. (Id. at 568-70.) Disclosure frequently occurs only when the child "can't take it anymore," and may be triggered by an anxiety-inducing event such as returning the child to the presence of the abuser after a period of time away. (Id. at 570-71.) Another common symptom, particularly among young children, is that the victim will not remember exactly when the abuse occurred, and may "blend" dates or discrete abusive acts together. (Id. at 573-74.)

On cross-examination, Dr. Lewittes acknowledged that he had not seen or treated Fatima, and that he therefore could not diagnose her with Child Sexual Abuse Accommodation Syndrome. (Id. at 576.) Dr. Lewittes also testified that severe sexual abuse could possibly cause a child to "regress" and thereby interfere with her ability to meet developmental landmarks. (Id. at 576-83.) In response to hypothetical questions from defense counsel, Dr. Lewittes opined that the presence of a drug-addicted mother would make it easier for an abuser to prey on a child victim; that four-year-old children cannot be manipulated or trained to tell complex stories about fabricated personal experiences; and that use of the word "vagina" is "not beyond the average four year old." (Id. at 582-88.)

4. <u>Dr. Flora Ramirez's Testimony</u>

Dr. Ramirez, a child-abuse physician-consultant for North Brooklyn Health Networks, testified about the results of her January 4, 2001 examination of Fatima.  This examination consisted of a detailed interview, during which Fatima recounted the alleged abuse, followed by a medical-history review and a physical examination.  (<u>Id.</u> at 617-18.)  Dr. Ramirez memorialized the results of this examination in the Ramirez Report.

During the physical examination, Dr. Ramirez conducted a visual inspection of Fatima's genitals by placing her index finger and thumb on Fatima's labia majora to determine the width of Fatima's hymenal opening.  (<u>Id.</u> at 620.)  Dr. Ramirez found that Fatima's hymenal opening was ten millimeters in diameter; according to Dr. Ramirez, a "normal four year-old" would have an opening of no more than four millimeters.  (<u>Id.</u> at 620-21.)  The hymen itself had "irregular borders" and "irregularities all around," as well as a "notch at the 5 o'clock position."[4]  (<u>Id.</u> at 621-22.)  Dr. Ramirez testified that the location of this notch was significant because abnormalities located between 3 o'clock and 9 o'clock "are the most common findings in children who are suspected of sexual abuse."  (<u>Id.</u> at 630.)  Dr. Ramirez could not determine whether the notch was due to trauma or a birth abnormality.  (<u>Id.</u> at 621, 630.)  Dr. Ramirez also observed that the posterior vaginal column appeared to be "thickening all inside"; that the fossa navicular was "ill defined and flattened"; that the posterior fourchette "felt like it was thinned out"; and that the rim of the hymenal opening, which "should be at least four to five millimeters in diameter," was "less than one millimeter and it looked worn out."  (<u>Id.</u> at 622-23, 629.)

Based upon both the interview and the physical examination, Dr. Ramirez concluded "to a reasonable degree of medical certainty" that Fatima had been sexually abused.  (<u>Id.</u> at 624.)

---

[4] Dr. Ramirez explained that because the hymenal opening is circular, locations on the hymen are indicated by analogy to the positions of the numbers on a clock face.  (TT 621.)

The abnormalities that Dr. Ramirez observed, including the thinning of the posterior fourchette, flattening of the fossa navicularis, and thinning of the hymenal rim, were indicative of repeated penetration with a finger or penis over time.  (Id. at 624-26.)  The depth and direction of these injuries foreclosed the possibility that they were self-inflicted.  (Id. at 631.)  Based on the state of healing, Dr. Ramirez concluded that the injuries had occurred six or more weeks before her examination (i.e., in mid-November 2000), and that "the entire sequence of events that caused" the injuries "could occur months before November 15."  (Id. at 626-27.)

Defense counsel did not call an expert witness to challenge or rebut Dr. Ramirez's testimony.  There is no indication in the record that counsel consulted a medical expert or requested that one be assigned by the court.[5]  During cross-examination, defense counsel did not ask Dr. Ramirez whether her methodology or the specific grounds for her conclusion that Fatima had been abused were supported by scientific literature or accepted in the medical community. Instead, counsel posed a series of hypothetical questions, ranging from probing to frankly baffling, about the severity and origin of Fatima's injuries.

Defense counsel initially elicited testimony from Dr. Ramirez that forcible penetration by an unlubricated adult penis would cause "a tremendous laceration," bleeding, and "tremendous pain."  (Id. at 633-34, 638-39.)  In response to defense counsel's question about what sort of damage would result if an adult "jammed" his fingers "into the vaginal area . . . all the way up," Dr. Ramirez testified that while injuries from digital penetration might be visible within two weeks of their occurrence, the tissue would return to its normal appearance within six weeks. (Id. at 634-38.)  Defense counsel also asked, hypothetically, what injuries would occur if an adult

---

[5] Defense counsel was assigned to represent Usher under Article 18-B of the New York County Law, which requires counties to provide legal representation to criminal defendants.  See N.Y. County Law § 722 (McKinney's 2004); Petition (Docket Entry # 1) 19 n.7.  In addition to legal representation, Article 18-B requires counties to provide funding for the retention of expert witnesses "upon a finding . . . that [such] services are necessary."  N.Y. County Law § 722-c (McKinney's 2004).

took "a washcloth, wrap[ped] it around her hand, and/or [took] another, even a sponge and jam[med] it up a child's vaginal area, and for whatever reason, briskly clean[ed] that area . . . very harsh and viciously" or "pushed it up her vagina [and] turned it around hard."  (Id. at 639-40.)  Dr. Ramirez answered that such actions might cause damage to the vaginal wall, particularly if the washcloth was "not soapy" or not lubricated.  (Id. at 640, 643.)  After establishing that Fatima did not have any sexually transmitted diseases, defense counsel then pursued a confusing line of questioning about Fatima's history of vaginal infection and vaginal itch before ceasing questioning.  (Id. at 644-50.)

On re-direct examination, Dr. Ramirez testified that Fatima's injuries were consistent with chronic penetration by a lubricated penis.  (Id. at 641.)  Dr. Ramirez also stated that Fatima's injuries were confined to the bottom half of her vagina, whereas the washcloth hypothetical posed by defense counsel would cause injuries to both the top and bottom portions of the vagina.  (Id. at 642.)

5.      Summations, Jury Deliberations, Verdict, and Sentencing

After the prosecution rested, defense counsel moved to dismiss the case "for failure to make out a prima facie case based on the evidence before the court."  (Id. at 652.)  Defense counsel did not elaborate or cite specific gaps in the evidence to support this motion, and the court summarily denied it.  (Id. at 653.)  The defense then rested without presenting any evidence.  (Id.)

On summation, defense counsel argued that Fatima's allegations were the product of coaching or imagination.  Fatima's use of "adult description[s]" such as the word "vagina" and the phrase "he put it all the way in" were evidence that she had been "trained to tell a story."  (Id. at 668-71.)  Her testimony that she had been abused "last week" in the elevator and that the act

of fellatio had caused the elevator to stop running was evidence that she was "using her imagination" or that she was imperfectly "parrot[ing]" a manufactured story.[6] (Id. at 672-73, 676.) Defense counsel also pointed out that Lugenia Reed had waited six weeks after the revelation of the alleged abuse to take Fatima to the doctor. (Id. at 668-69.)

In place of specific evidence to rebut Dr. Ramirez's medical testimony, defense counsel offered speculation grounded in what he termed "common sense." Defense counsel theorized that Fatima's injuries were the product of "vaginal itching, which if unattended, should, by common sense, lead to substantial scratching, which, by common sense, should lead to bruising and enlargement of the vaginal hymenal wall." (Id. at 668-69.) This vaginal itching created an untreated "rash," which was "eating away at the flesh." (Id. at 674.) Defense counsel stated that Fatima's injuries were "more consistent with vicious scrubbing, and dealing with constant scratching of the rash in the vaginal area, than they [were] with sexual intercourse." (Id. at 677-78.) He also postulated, as a "lay person speaking," that putting an unlubricated adult finger into a four-year-old's anus would "cause a terrible, terrible amount of damage." (Id. at 677.) These speculations met with repeated sustained objections. (See, e.g., id. at 673-75.)

The prosecution's summation urged the jury to consider, inter alia, the Ramirez Report, "which you are allowed to read." (Id. at 681.) The prosecution declared that the Ramirez Report was "consistent" with Dr. Ramirez's testimony and would demonstrate the "[r]epeated, chronic sexual abuse of this child." (Id. at 693.) The prosecution also used Laguerre's testimony to construct a detailed narrative of Fatima's "outcry" on November 17, 2000, including the contents of Fatima's phone call to Laguerre. (See id. at 685-86.) In particular, the prosecution noted that

---

[6] Defense counsel characterized Fatima's testimony about the elevator incident as a claim that Usher's "magic penis made [the] elevator stop running." (TT 676.) Defense counsel made several other unseemly or incongruous statements during summation, for example describing Fatima – a five-year-old alleged sex-abuse victim – as "acerbic" and "pretty in her own way." (Id. at 668.) He also attempted to close the summation with an invocation of the Salem witch trials, which the court cut off and declared "irrelevant." (Id. at 680.)

Fatima used the word "cooty" on the phone, consistent with her firsthand testimony. (Id. at 682, 686.)

With respect to timing, the prosecution cited the colloquy between the Fatima and the trial judge, (id. at 544-45), as evidence that Usher began abusing Fatima on July 25, 2000. (Id. at 683.) The prosecution also claimed that Dr. Ramirez's testimony established that Fatima's injuries started "back six months from January 4," i.e., in July of 2000. (Id. at 688.)

During deliberations, the jury asked to see a copy of the Ramirez Report and asked that Fatima Reed's testimony be read back to them in its entirety. (Id. at 728-29, 737-38.) After one day of deliberations, see id. at 729, 742, 747, the jury convicted Usher of the top count in the indictment, Course of Sexual Conduct Against a Child in the First Degree. (Id. at 748.) That count required proof that, over a period of three months or more, Usher engaged in two or more acts of sexual conduct (including at least one act of sexual intercourse, oral sexual conduct, anal sexual conduct or aggravated sexual contact) with a child less than eleven years old. N.Y. Penal Law § 130.75(1)(a).

At sentencing, Usher maintained his innocence. (Sentencing Transcript (Docket Entry # 7) 10-11.) The court sentenced Usher to the maximum term of 25 years' imprisonment plus five years of post-release supervision. (Id. at 12.) As of March 2006, Usher was imprisoned at Green Haven Correctional Facility.

### C.     Appeal and Post-Conviction Proceedings

With new counsel, Usher appealed to the Appellate Division, arguing that trial counsel was ineffective because he introduced the otherwise inadmissible Ramirez Report, failed to consult a medical expert, and "cured" the prosecution's alleged failure to establish the durational element of the crime. (See Brief for Defendant-Appellant (Habeas Pet. Ex. B (§ 440 Ex. D))

(Docket Entry # 1, Att. 2).)  The Appellate Division affirmed the conviction in a brief opinion, stating that "[a] review of the totality of the circumstances of this case shows that the defendant was provided with meaningful representation."  People v. Usher, 2 A.D.3d 545, 546 (N.Y. App. Div. 2d Dep't 2003).  The Court of Appeals denied Usher leave to appeal in February 2004. People v. Usher, 777 N.Y.S.2d 33 (2004).

1.  Section 440 Motion and Affidavit of Dr. Mark Taff

In 2005, Usher filed a state post-conviction motion under N.Y.C.P.L. § 440 to vacate his judgment of conviction.  (See § 440 Motion to Vacate Judgment (Habeas Pet. Ex. B) (Docket Entry # 1, Att. 1).)  Usher's § 440 motion asserted ineffective assistance, based on the same grounds as his direct appeal.  (See id.)  The motion was denied on the ground that his ineffectiveness claim was identical to the claim he had raised and lost on direct appeal.  (See Decision and Order Denying § 440 Motion (Habeas Pet. Ex. A) (Docket Entry # 1, Att. 1).)  The Appellate Division denied Usher leave to appeal.  (Decision and Order Denying Application to Appeal (Habeas Pet. Ex. H) (Docket Entry # 1, Att. 3).)

Usher's § 440 motion included an affidavit from Dr. Mark Taff, a "Forensic Pathologist and Consultant" for a number New York counties, hospitals, city agencies, and legal-services organizations.  (Affidavit and Curriculum Vitae of Mark L. Taff, M.D. (Docket Entry # 1 Ex. 1 (Habeas Petition Ex. A)) ("Taff Aff.") at 6.)  At the time he submitted the affidavit, Dr. Taff had testified as an expert in forensic pathology in over 200 cases involving child abuse.  (Id. ¶ 1.)  In preparing his affidavit, Dr. Taff reviewed Dr. Ramirez's testimony, the Ramirez Report, and the parties' briefs to the Appellate Division.  (Id. ¶ 2.)

In his assessment of the Ramirez Report, Dr. Taff identified several deficiencies in Dr. Ramirez's general methodology and approach.  Dr. Ramirez took no photographs during her

physical examination and apparently did not use a colposcope, which Dr. Taff identified as "the standard instrument used in making the measurements she made." (Id. ¶ 3.) Instead, Dr. Ramirez placed her thumb and index finger on Fatima's labia majora to measure her hymenal opening. (Id. ¶ 6.) This method "can stretch or distort tissue" and thereby "undermine the accuracy of the measurement." (Id.) Dr. Taff also took issue with the fact that Dr. Ramirez interviewed Fatima about her allegations prior to conducting the physical examination: according to Dr. Taff, the process of drawing conclusions from physical examinations involves "subjective determinations," and Dr. Ramirez's conclusions therefore may have been "colored by [her] expectations." (Id. ¶ 5.)

With regard to Dr. Ramirez's testimony that the diameter of the hymenal opening on a "normal four year old" is four millimeters, and that Fatima's 10-millimeter opening therefore indicated sexual abuse, Dr. Taff stated that "it is clear from the scientific literature that a large hymenal opening is simply not evidence of abuse." (Id. ¶ 7.) Furthermore, because hymenal diameter varies according to a child's size and Fatima was "at the high end of a continuum of expected height and weight for a four-year-old," the 10-millimeter opening was "easily explainable as a variant of normal rather than as an indication of sexual abuse." (Id.)

With regard to the "notch" that Dr. Ramirez observed on Fatima's hymen, Dr. Taff stated that, even assuming the notch was due to trauma rather than physical abnormality, the healing that would have occurred between the last alleged abuse and the examination would have made it impossible for Dr. Ramirez to ascertain when the trauma occurred. (Id. ¶ 8.) Dr. Taff also took issue with Dr. Ramirez's testimony that Fatima's fossa navicular was "flattened" and that her posterior fourchette was "thinning." (Id. ¶ 9.) According to Dr. Taff, the term "flattened" is "without meaning in the scientific community," while "thinning" of the posterior fourchette

"might or might not be" evidence of abuse. (Id.) Because Dr. Ramirez's observations were so

vague, and because she neglected to photograph or measure the alleged abnormalities, her

conclusion that the abnormalities were evidence of sexual abuse was "unsupported." (Id.)

Dr. Taff also noted that defense counsel failed to inquire whether the abnormalities could have

been caused by Fatima's attempts to alleviate the vaginal itching described in the Ramirez

Report, (id.), and that he failed to question Dr. Ramirez about her equivocal conclusion in the

Ramirez Report that the physical conditions she observed "can be due to chronic penetrations

obtained from [the] child's history." (Id. ¶ 11 (quoting Ramirez Report at 16).)

2.    Federal Habeas Corpus Proceedings

Usher filed this habeas petition in March 2006. On January 13, 2010, this court held an

evidentiary hearing ("Habeas Hearing") at which Usher's trial counsel testified about his

representation. See Sparman v. Edwards, 154 F.3d 51, 52 (2d Cir. 1998) (district courts

evaluating claims of ineffectiveness should "offer the assertedly ineffective attorney an

opportunity to be heard and to present evidence, in the form of live testimony, affidavits, or

briefs").

Defense counsel testified that he had been a criminal defense attorney for 13 years, and

that he had tried over one hundred criminal cases, including several child abuse cases. (Habeas

Hearing Transcript (Docket Entry # 24) ("HT") 76-77.) Before Usher's trial, counsel met with

Usher multiple times to discuss strategy, and retained an investigator (now deceased) in a futile

attempt to craft an alibi defense. (Id. at 78, 81.) Counsel also consulted several doctors to

ascertain whether Usher's diabetes might have rendered him impotent, although no doctor would

verify this claim. (Id. at 79.) Counsel confirmed that, although he received the Ramirez Report

prior to trial, he did not consult a doctor or medical expert when reviewing the Report or

18

conceiving his trial strategy, and he did not ask the trial court to appoint one.  (Id. at 59-60, 85-86.)  Counsel did not consult any doctors or medical experts regarding physical indicia of sexual abuse in pre-pubertal females.  (Id. at 59-60.)  He did, however, meet with an expert witness from the 18-B panel to discuss the effects of sexual abuse on a child's developmental landmarks.  (Id. at 43-44.)  Counsel also claimed that he has independent expertise, inasmuch as he is a member of a "psych national honor society" and "keep[s] abreast of what is going on in the industry."  (Id. at 46.)

Counsel offered several reasons why he did not call an expert who could challenge either the Ramirez Report or Dr. Ramirez's testimony.  According to counsel, the testimony of a medical expert for the defense would only have "reaffirm[ed] the horrors in the medical record" and "throw[n] more ugliness at the jury, just to highlight everything even further."  (Id. at 83, 87.)  A defense expert would have "go[ne] back over all those injuries again and again" and thereby "rehash[ed] and help[ed] the People's case."  (Id. at 83, 92.)  Counsel decided that the best strategy was to "co-op[t] the People's expert" in an attempt to show either that Fatima's injuries came from a benign source or that Fatima was lying.  (Id. at 62, 84, 87-88.)

The court asked defense counsel how he could have reasonably determined that calling an expert witness would be counterproductive without first consulting an expert to gain an understanding of the technical medical issues in the case.  (Id. at 84-85.)  Counsel answered only that he "[could] not recall whether [he] spoke to a doctor."  (Id. at 85.)  When the court asked counsel whether "it would have been a prudent act on your part to consult an expert before deciding whether or not it would be worthwhile for the defense to challenge Dr. Ramirez's expertise," counsel again stated that he "[didn't] recall speaking to a doctor."  (Id. at 86.)

Counsel also stated that he considered the Ramirez Report to be "self-explanatory" with respect to the origin of Fatima's injuries.  (Id. at 85.)

At the hearing, Usher's habeas counsel introduced three medical studies that were published prior to Usher's criminal trial.  Two of these studies conclude that the diameter of the hymenal opening is not a reliable indicator of sexual abuse.  (See Habeas Petition Ex. J, Abbey Berenson, The Prepubertal Genital Exam: What Is Normal and Abnormal, 6 Current Opinion in Obstetrics and Gynecology 526, 528 (1994) (Docket Entry # 21); Habeas Petition Ex. K, J. McCann, J. Voris & M. Simon, Genital Injuries Resulting From Sexual Abuse: A Longitudinal Study, 89 Pediatrics 307, 309 (1992) (Docket Entry # 21).)  Both of these studies contradict Dr. Ramirez's trial testimony that the diameter of Fatima's hymenal opening indicated sexual abuse. (TT 621.)  The third study, from March 2001, states that genital examinations for sexual-abuse indicia should be conducted using illumination, magnification, and a colposcope to make accurate measurements.  (Habeas Petition Ex. I, Sheela L. Lahoti et al., Evaluating the Child For Sexual Abuse, American Family Physician, March 1, 2001, at 2 (Docket Entry # 21).)  As noted in the Taff Affidvait, Dr. Ramirez did not follow these procedures during Fatima's physical examination.  (Taff Aff. ¶¶ 3, 6.)  At the Habeas Hearing, defense counsel admitted that he was not aware of these studies at the time of Usher's trial.  (HT 62, 24.)

Counsel researched the admissibility of the Ramirez Report prior to trial and concluded that he could redact certain material, but that "[o]ther material would come in as a present state impression, a purpose for the treatment, the psychiatric state of the individual – alleged victim. So I knew what I was doing when I put the medical record in."  (Id. at 24-25.)  During the trial, he did not expect that the prosecution would enter the Ramirez Report into evidence.  (Id. at 92.)

Counsel did not move to redact the five pages of interview notes or any of the interview summaries that appeared in the Ramirez Report. (Id. at 25.) According to counsel, he and Usher decided prior to trial to "put the record in au naturel, as a strategy" to highlight "contradictions" in the records and to avoid the inference that the defense was obscuring damaging information. (Id. at 83.) Counsel repeatedly invoked the existence of "contradictions" in the medical records in defense of his decision to submit the entire Ramirez Report into evidence. (Id. at 41, 83, 92, 105-06.) He did not explain the nature of these contradictions, however, stating only that "[t]here were contradictions in the injuries versus the statements in the report," and that a notation in the Ramirez Report that Fatima held up five fingers to indicate how many times Usher had digitally penetrated her was contrary to "the other evidence." (Id. at 41, 106.) On cross-examination, he agreed with the state's attorney that the medical records showed that Fatima had met her expected developmental landmarks, that Fatima was referred for a psychiatric exam, that she had no history of bleeding or lacerations, that she had a history of vaginal itch, and that, at the time of the interview with Dr. Ramirez, Fatima had not revealed the full extent of the alleged abuse to her mother or the police. (Id. at 93-95.)

Counsel testified that he was aware when he cross-examined Marilyn Laguerre that Fatima's mother, and not Laguerre, was supposed to offer the limited testimony concerning Fatima's "prompt outcry." (Id. at 15.) He did not believe at the time that asking Laguerre when she first learned of Fatima's injuries would permit the prosecution to elicit details of Fatima's outcry on cross-examination. (Id. at 16-17.) Counsel asked Laguerre about Fatima's initial outcry because he wanted to establish that six weeks passed between when Laguerre learned of the abuse and when Fatima was first taken for medical treatment. (Id. at 96-97.)

**II.    DISCUSSION**

    **A.    Standard of Review**

        The only claim that Usher raises on this petition is that he was denied his constitutional right to effective assistance of counsel.  Because this claim was adjudicated on the merits in his state-court appeal, his habeas petition is subject to the deferential standard of review of state adjudications mandated by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254(d).  Under AEDPA, a district court may only issue a writ of habeas corpus if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or if it "was based on an unreasonable determination of the facts in light of the evidence presented."  Id. Usher's petition is premised solely on the first ground for relief.

        As a threshold matter, the analytical framework for Sixth Amendment ineffectiveness claims set forth in Strickland v. Washington, 466 U.S. 668 (1984), and relied upon by Usher here, is "clearly established Federal law" for purposes of Section 2254(d).  Williams v. Taylor, 529 U.S. 362, 390 (2000) (O'Connor, J., concurring, writing for the majority in this part).

        With respect to the question of whether the Appellate Division's decision was "contrary to, or involved an unreasonable application of" Strickland, the Supreme Court has instructed that,

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Id. at 412-13.  The state-court decision denying Usher's appeal relied on People v. Baldi, 54 N.Y.2d 137 (N.Y. 1981) to conclude that Usher's counsel was not ineffective.  See People v.

Usher, 2 A.D.3d 545, 546 (N.Y. App. Div. 2d Dep't 2003). The Second Circuit has held that, under Williams, the Baldi standard is not "'diametrically different, opposite in character or nature, or mutually opposed' to the standard articulated in Strickland." Lindstadt v. Keane, 239 F.3d 191, 199 (2d Cir. 2001) (quoting Williams, 529 U.S. at 405). The Supreme Court has not confronted a set of facts materially indistinguishable from those in the instant case. Accordingly, the "contrary to" clause is not at issue here, and the only question is whether the state court's decision was an unreasonable application of Strickland.

In order to establish that a state court unreasonably applied federal law, it is not sufficient that a federal court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Williams, 529 U.S. at 411. Rather, "some increment beyond error is required." Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000). However, "the increment need not be great; otherwise habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." Id. (internal quotation marks and citation omitted).

The Appellate Division did not set out its reasoning for denying Usher's ineffective assistance claim, stating only that "[a] review of the totality of the circumstances of this case shows that the defendant was provided with meaningful representation." Usher, 2 A.D.3d at 546. "When a state court fails to articulate the rationale underlying its rejection of a petitioner's claim, and when that rejection is on the merits, the federal court will focus its review on whether the state court's ultimate decision was an 'unreasonable application' of clearly established Supreme Court precedent." Eze v. Senkowski, 321 F.3d 110, 125 (2d Cir. 2003) (quotation and citation omitted). Accordingly, this court considers whether the Appellate Division's decision to reject Usher's ineffectiveness claims was reasonable under Strickland.

**B.** **Ineffective Assistance of Counsel**

The Sixth Amendment guarantee of counsel in criminal trials encompasses the right to reasonably effective assistance of counsel. See, e.g., McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970). In order to establish a violation of the right to effective counsel, a claimant must demonstrate that "counsel's performance was deficient" and that "the deficient performance prejudiced the defense." Strickland, 466 U.S. at 687. The Second Circuit has cautioned that "[t]he Strickland standard is rigorous, and the great majority of habeas petitions that allege constitutionally ineffective counsel founder on that standard." Lindstadt, 239 F.3d at 199.

To determine whether counsel's conduct was deficient, "the court must . . . determine whether, in light of all of the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690. In making this determination, the court must be "highly deferential" and make "every effort . . . to eliminate the distorting effects of hindsight." Id. at 689. Counsel does, however, have a duty to investigate, and while "strategic choices made by counsel after thorough investigation . . . are virtually unchallengeable," a decision not to investigate is reasonable only "to the extent that reasonable professional judgments support the limitations on investigation." Id. at 690-91.

In order to establish that counsel's deficient conduct was prejudicial, a claimant must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome," id., and a claimant therefore need not demonstrate that a different result was "probable" or "more likely than not." See Nix v. Whiteside, 475 U.S. 157, 175 (1986) ("[A] defendant need not establish that the attorney's deficient performance more likely than not altered the outcome in order to establish prejudice

under <u>Strickland</u>").  When assessing prejudice, the court "must consider the totality of the evidence before the judge or jury."  <u>Id.</u> at 698.  In short, then, <u>Strickland</u> directs courts to consider whether the aggregate effect of counsel's errors undermines confidence in the resulting conviction.

### C.    Defense Counsel's Allegedly Deficient Conduct

Petitioner identifies four alleged errors committed by defense counsel at trial: (1) counsel failed to consult or call an expert witness who could challenge or rebut the Ramirez Report and Dr. Ramirez's testimony; (2) he needlessly entered an unredacted copy of the otherwise inadmissible Ramirez Report into evidence, thereby bolstering Fatima's credibility; (3) he cured a defect in the prosecution's case by introducing evidence that established an element of the crime, namely, that the alleged course of sexual conduct occurred over a period not less than three months; and (4) he needlessly elicited damaging "outcry" testimony from Laguerre, which in turn opened the door for the prosecution to elicit further damaging testimony from her.  The court considers each of these alleged errors in turn, and then assesses their cumulative prejudicial effect.

### 1.    Failure to Consult With or Call a Medical Expert

The Second Circuit has repeatedly instructed that, "[i]n sexual abuse cases, because of the centrality of medical testimony, the failure to consult with or call a medical expert is often indicative of ineffective assistance of counsel."  <u>Gersten v. Senkowski</u>, 426 F.3d 588, 607 (2d Cir. 2005) (citing cases); <u>see</u> <u>also</u> <u>Lindstadt</u>, 239 F.3d at 202 (in sex abuse case, state court's conclusion that petitioner did not receive ineffective assistance was unreasonable where, <u>inter alia</u>, defense counsel did not consult or call medical expert to challenge prosecution's medical expert); <u>Pavel v. Hollins</u>, 261 F.3d 210, 223-24 (2d Cir. 2001) (same); <u>Eze</u>, 321 F.3d at 127-28

(same).[7]  Such an omission is especially probative of ineffectiveness "where the prosecution's

case, beyond the purported medical evidence of abuse, rests on the credibility of the alleged

victim, as opposed to direct physical evidence such as DNA, or third party eyewitness

testimony."  Gersten, 426 F.3d at 607.  Because of the "particular importance of physical

evidence in child sexual abuse cases that turn into credibility contests" and the vagaries of

physical indicia of abuse, consultation with an expert is a crucial aspect of a defense attorney's

obligation to perform reasonable investigations.  Eze, 321 F.3d at 128.

In this case, where the only direct evidence of abuse was the testimony of a five-year-old

child, Dr. Ramirez's interpretation and explanation of the physical evidence was vital to the

---

[7] This court is mindful of AEDPA's directive that a writ of habeas corpus can only be granted upon a showing that
the state court unreasonably applied Supreme Court precedent, rather than lower-court precedent, and that lower-
court decisions construing Supreme Court precedent therefore cannot be used to determine whether a petitioner's
federal rights were violated.  See, e.g., Mask v. McGinnis, 252 F.3d 85, 90 (2d Cir. 2001) (per curiam) (petitioner's
showing that Second Circuit precedent was unreasonably applied did not entitle petitioner to habeas relief, since
AEDPA requires showing that Supreme Court precedent was unreasonably applied).  However, it is appropriate and
indeed obligatory for this court to follow Second Circuit precedent regarding what constitutes an unreasonable
application of clearly established Supreme Court law under AEDPA.  See Gersten, 426 F.3d at 607 n.1 (district
courts are "bound to apply this Court's precedents governing when applications of Strickland are 'unreasonable,'
and in doing so [do] not violate, but rather, effectuate[ ] the AEDPA standard of review").  Accordingly, while this
court looks exclusively to the Supreme Court's ineffective-assistance jurisprudence to determine what law the state
court was bound to apply, it looks to the habeas jurisprudence in this circuit to determine whether that application
was reasonable.
        This conclusion is not altered by the Supreme Court's decision in Carey v. Musladin, 549 U.S. 70 (2006).
In Musladin, the Ninth Circuit relied on its own precedent to conclude that the Supreme Court's test for whether a
government-sponsored courtroom practice is inherently prejudicial also extends to spectator conduct.  Id. at 651-52.
Based on this interpretation, the Ninth Circuit held that a state court's application of an inherent-prejudice test for
spectator conduct that differed from the Supreme Court's test for government-sponsored practices was unreasonable
under AEDPA.  Id.  The Supreme Court reversed, noting that, regardless of the fact that various appeals courts had
extended the inherent-prejudice test to spectator conduct, the effect of spectator conduct on a defendant's fair-trial
rights "is an open question in our jurisprudence."  Id. at 653-54.  Musladin therefore reaffirms the basic AEDPA
principle that the substantive contours of a given right are determined solely by reference to Supreme Court case
law, and that habeas courts therefore may not consider lower-court interpretations of Supreme Court case law to
determine whether a state court has unreasonably applied federal law.  But Musladin does not upset the collateral
principle that the question of what is and is not a reasonable application of Supreme Court law under AEDPA is a
question of statutory interpretation that is expressly committed to the lower courts.  See 28 U.S.C. § 2254(d); see
also Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000) (interpreting language of § 2254(d) to conclude that
"some increment beyond error is required" for a state court's application of federal law to be considered
"unreasonable" under AEDPA).  As with all questions of statutory interpretation, the appellate courts are free to
reach conclusions and announce rules regarding AEDPA's application to various factual circumstances (subject of
course to the Supreme Court's interpretive guidance), and the courts in this circuit are bound by that precedent.
Gersten, 426 F.3d at 607 n.1; see also Schulz v. Marshal, 345 Fed. Appx. 627, 630 (2d Cir. 2009) (citing Second
Circuit opinion to support conclusion that state court's application of Supreme Court law was unreasonable).

prosecution's case. Nonetheless, defense counsel failed to consult with a medical expert who could have assisted him in preparing a defense or challenged the physical evidence at trial. The consequences of that failure are evident in the Taff Affidavit, the medical studies submitted by petitioner, and the trial transcript. Counsel failed to inquire into the scientific basis for Dr. Ramirez's methods or conclusions and permitted questionable medical testimony to go unchallenged. In particular, counsel's ignorance prevented him from attacking the accuracy and significance of Dr. Ramirez's observations of Fatima's hymenal opening, fossa navicular, and posterior fourchette, as well as the conclusions that Dr. Ramirez drew from those observations. (See Taff Aff. ¶¶ 7-9; Habeas Pet. Exs. I-K.) In place of informed cross-examination, counsel posed a series of speculative, inartful, and occasionally crude hypothetical questions that failed to address the weaknesses of the physical evidence and Dr. Ramirez's testimony.

In light of such evidence, respondent's contention that defense counsel's cross-examination of Dr. Ramirez was the product of a "reasonable strategy" is unavailing. ((Respondent's Affidavit in Opposition (Docket Entry # 6) ("Opp. Aff.") 65.) Whether or not counsel thought he could successfully "co-opt" Dr. Ramirez's testimony, and whether or not he was legitimately worried that putting on a defense expert would help the prosecution's case by "going back over all [the] injuries," (HT 83), counsel's failure to educate himself about the implications and validity of Dr. Ramirez's conclusions prevented him from making a reasoned decision as to the best defense strategy. See Wiggins v. Smith, 539 U.S. 510, 521 (2003) (reasonableness of a purported strategic decision judged "in terms of the adequacy of the investigations supporting it"); Gersten, 426 F.3d at 609-10 (counsel's decision not to consult medical expert in sex-abuse case constituted deficient performance where counsel "decided that it would be futile to challenge the medical and psychological evidence without having

reasonably investigated whether that was in fact the case, and lacked sufficient information reasonably to determine that such an investigation was unnecessary").  In particular, counsel's failure prevented him from mounting any sort of attack on the only direct evidence of sexual abuse.[8]  See Eze, 321 F.3d at 112 ("The teaching of the law in this Circuit is that defense counsel is obliged, whenever possible, to . . . attack vigorously the reliability of any physical evidence of sexual contact between the defendant and the complainant").

The circumstances of this case are directly analogous to those in Gersten.  There, the court observed:

> The prosecution's case rested centrally on the alleged victim's testimony and its corroboration by the indirect physical evidence as interpreted by the medical expert. The medical expert testimony was central not only because it constituted the most extensive corroboration that any crime occurred, but because to undermine it would undermine the alleged victim's credibility and thus the entire prosecution case as to all charges. . . .  [W]e have explained that medical expert consultation or testimony is particularly critical to an effective defense in sexual abuse cases where direct evidence is limited to the victim's testimony.  The situation may be different in a case where objective evidence exists implicating petitioner in a crime, such as bodily fluids identified as the petitioner's, or where the prosecution offered third party eyewitness testimony. But in a case where the only direct evidence that any crime occurred or that, if it did, the petitioner committed it, was the testimony of the alleged victim, for defense counsel to simply concede the medical evidence without any investigation into whether it could be challenged was performance that the state court could not reasonably find to be objectively reasonable.

---

[8] Respondent claims that defense counsel "made a tactical determination to attack the state's case – which was based upon the credibility of the child – by impeaching the state's expert, Dr. Ramirez, instead of calling his own doctor." (Resp. Post-Hearing Mem. (Docket Entry # 22) at 9.)  Defendant's choice of this strategy did not somehow relieve him of his obligation to make diligent pre-trial efforts to advance it.  To the contrary, it required him to gather technical facts and information that he could use to impeach Dr. Ramirez and attack her conclusions – the type of facts and information that only a medical expert could provide.  See Gersten, 426 F. 3d at 609-10.  Defense counsel also testified at the Habeas Hearing that part of his defense strategy was to show, via "contradictions" in the Ramirez Report, that Fatima was lying and had been coached to tell a story.  (HT 41, 95; see also TT 669.)  Quite obviously, any evidence that could have undermined the physical evidence of abuse would have buttressed this defense.  Whatever value these strategies may have had in the abstract were completely vitiated by counsel's inaction.

Gersten, 426 F.3d at 608 (citations omitted).  In this case, the state court could not have reasonably concluded that defense counsel's failure to consult or call an expert did not constitute deficient performance under Strickland.

        2.        Entering the Ramirez Report into Evidence

Usher contends that defense counsel's decision to submit a complete, unredacted copy of the Ramirez Report into evidence was unjustified and prejudicial.  In particular, Usher claims that the notes from Dr. Ramirez's interview of Fatima were inadmissible under New York law, and that counsel's decision to offer the Ramirez Report without attempting to redact the notes was therefore grossly erroneous.  The interview notes contained a wealth of damaging information, including Fatima's statements that the alleged abuse began after her birthday on July 25, 2000; that she referred to her vagina as her "cooty" and her anus as her "butt"; that Usher put his fingers in her "cooty" five times and in her "butt" five times; and that on twelve occasions Usher put "grease" on his penis and then "put his penis" in her "cooty."  (Ramirez Report at 4-6.)  These prior consistent statements bolstered Fatima's testimony and established an element of the prosecution's case, namely, that the alleged abuse occurred over a period not less than three months.  See N.Y. Penal Law § 130.75(1)(a).

As a threshold matter, Usher is incorrect that all of the interview notes were per se inadmissible under New York law.  Under the business-records hearsay exception, statements made to medical personnel are admissible to the extent that they relate to the diagnosis and treatment of the patient.  Williams v. Alexander, 309 N.Y. 283, 286-289 (1955).  New York courts have held that the manner in which a sexual-abuse victim was injured is germane to her diagnosis and treatment and, accordingly, have admitted statements made to medical personnel concerning the victim's medical history, People v. Rogers, 8 A.D.3d 888, 892 (N.Y. App. Div.

3d Dep't 2004), as well as descriptions of specific incidents of abuse. People v. Bailey, 252 A.D.2d 815, 815-816 (N.Y. App. Div. 3d Dep't 1998); People v. White, 306 A.D.2d 886, 886 (N.Y. App. Div. 4th Dep't 2003). In this case, Dr. Ramirez testified that she relied on the information she obtained from Fatima's interview to make her diagnosis that Fatima had been sexually abused and that this was her ordinary practice. (TT 624.) Fatima's descriptions of the manner, frequency, and duration of the alleged abuse – the prior consistent statements that bolstered her testimony and inadvertently established the durational element of the crime – were presumably the statements that Dr. Ramirez found most valuable in making her diagnosis and in deciding on a course of treatment.

Because Fatima's medically-relevant descriptions of the alleged abuse were admissible, it is irrelevant whether they were offered into evidence by defense counsel or the prosecution. These portions of the interview notes were obviously useful to the prosecution, and it would have been reasonable for defense counsel to conclude that he should employ them in his cross-examination of Laguerre rather than wait for the prosecution to introduce them later. While defense counsel's use of the records may have been inept and ultimately detrimental to his case, the mere fact that he preempted the prosecution and entered the portion of the records describing the alleged abuse does not constitute deficient conduct under Strickland.

The fact that some of Fatima's descriptions of the physical abuse were admissible, however, does not mean that defense counsel was justified in placing a complete and unredacted copy of the Ramirez Report before the jury. The Ramirez Report contains pages of information and statements that are not relevant to Fatima's treatment or diagnosis and therefore not covered by the business/hospital-records exception. Much of this information is highly damaging. For example, the notes from Lugenia Reed's interview report that Fatima "told [Reed] Roy Usher

touched her," that Reed called the police immediately afterward, that Usher was arrested, incarcerated, and released, and that Usher "kept calling [Reed]" and came to her house on Christmas Day. (Ramirez Report at 2.) The notes from Fatima's interview include Fatima's description of the sleeping arrangements in Lugenia Reed's apartment and the location in the apartment where Usher allegedly molested her; a brief narrative of the events leading up the first alleged incident of abuse; Fatima's statements that Usher told her to put "grease" on his penis and that, after digitally penetrating her, Usher told her "not to tell [her] mom"; Fatima's explanation of why Usher was able to abuse her in the apartment without her mother finding out (because Fatima's brother "was a baby then" and her mother "was out shopping"); and Fatima's description of what she told her mother and the police about the alleged abuse, including Fatima's assertion that she did not tell anyone that Usher penetrated her vagina with his penis because it would "make [her mother] crazy." (Id. at 2-4.) Most damagingly, the Ramirez Report repeatedly identifies Usher by name and includes verbatim statements from Fatima such as "Roy told me to put grease on him" and "Daddy put his fingers . . . in my cooty." (Id. at 2, 3, _, _; see also id. at _ (listing "Suspected Perpetrator" as Roy Usher)); cf. Bailey, 252 A.D.2d at 815-16 (hospital records in sexual assault case redacted to delete reference to defendant's name).

These hearsay statements (including the identity of the perpetrator) may have provided context for Dr. Ramirez's report, but they were not directly germane to Fatima's diagnosis or treatment. See Alexander, 309 N.Y. at 288 (error to admit details regarding circumstances of the incident "where they are immaterial to, and were never intended to be relied upon in, the treatment of the patient"; although "[t]he particulars may be a natural subject of the doctor's curiosity . . . neither the inquiry nor the response properly belongs in a record designed to reflect the regular course of the hospital's business"). Therefore it was error for defense counsel to

submit the Ramirez Report into evidence without attempting to redact the portions that were immaterial to Fatima's diagnosis or treatment.

At the Habeas Hearing, defense counsel offered several reasons for his decision not to redact the records, all of which contradicted each other or the facts of the case. Counsel's primary argument was that redaction would have "create[d] an inference that was negative," and that therefore it was "best to show that we were hiding nothing in the medical records." (HT 83, 92-93.) While perhaps rational in the abstract, this "strategy" was wholly untenable in light of the actual contents of the Ramirez Report. The extraneous details in Fatima's interview notes are disturbing and inflammatory. Usher is described sexually abusing Fatima in her own home while her mother was away, coaxing Fatima to put "grease" on his penis, and trying to silence her afterwards. The interview notes include evocative details, such as that Fatima dropped into a whisper when asked to identify Usher, and that she "suddenly perch[ed] herself on the chair" before describing the alleged abuse. (Ramirez Report at 3, 4.) Fatima's mother stated that, despite having been arrested, Usher "kept calling her, [and] in fact came to her place Christmas day." (Id. at 2.) These and other contextual details transform what could have been a narrow incident report into a coherent and frankly harrowing narrative of chronic abuse, with a suggestion of continuing danger. It is hard to imagine that a jury faced with a redacted document would have inferred facts more damaging to Usher than those actually contained in the medical records.

Defense counsel repeatedly claimed during the Habeas Hearing that another reason he introduced a full version of the records was to highlight certain "contradictions." (See id. at 41, 83, 92, 105-06.) Despite questioning from this court, however, defense counsel could not articulate what these contradictions were, apart from stating that Fatima's use of five fingers to

32

indicate the number of times she'd been digitally penetrated was contrary to "the medical records in the grand jury, the other evidence." (Id. at 106.) In the absence of a coherent explanation, this court has reviewed the record in an unsuccessful attempt to identify this contrary evidence. It is sufficient for present purposes to note that the contradiction, if it exists, would not have been apparent to an ordinary juror from the medical records alone. Defense counsel did not point out any of these supposed inconsistencies at trial, either during his cross-examinations of Dr. Ramirez and Fatima or in his summation.[9] (See id. at 26-27.)

Finally, counsel's decision to enter an unredacted version of the medical records was wholly at odds with his professed trial strategies. For example, counsel claimed at the Habeas Hearing that he did not put on a medical expert because he did not want to "throw more ugliness at the jury." (Id. at 83.) If counsel's goal was to avoid ugliness, he should have kept as much of the Ramirez Report away from the jury as possible. Counsel also testified that his basic defense strategy was to show that someone other than Usher had caused Fatima's injuries, and that she had been coached to accuse him. (Id. at 41, 62.) That being the case, it is hard to conceive of a rational reason that counsel would hand the jury a document in which Fatima repeatedly

---

[9] Respondent suggests that the medical records were useful because they contradicted Fatima's and Dr. Lewittes' trial testimony. Thus, according to respondent, counsel "introduced the records to demonstrate contradictions between the version that the child gave to the examining doctor, and what she testified to in court." (Resp. Post-Hearing Mem. 16.) As previously noted, these alleged contradictions are not discernible from the record. Respondent also states that "the records demonstrated that the child had met all of her developmental landmarks – refuting Dr. Lewittes' testimony that a sexually-abused child might suffer regression and fail to meet those landmarks." (Id.) Of course, the fact that Fatima met her landmarks does not "refute" Dr. Lewittes' general assertion that an abused child might not meet them. More importantly, neither Fatima nor Dr. Lewittes had testified when counsel entered the medical records into evidence, so counsel could not possibly have "introduced the records to demonstrate contradictions" between the records and the witnesses' testimony. To the contrary, at the time counsel moved the records into evidence, he knew to a certainty that the records were highly damaging, but could only guess that the records would be useful to impeach Fatima or Dr. Lewittes. That sort of high-risk, low-reward speculation is incompatible with the reasoned decisionmaking that Strickland requires. See Strickland, 466 U.S. at 90 (reasonableness of counsel's conduct must be assessed "as of the time of counsel's conduct"). By far the more reasonable course would have been to wait and use the records only as necessary to impeach prior testimony.

identified Usher as her abuser and provided extraneous atmospheric and interstitial details that made her accusations more, rather than less believable.[10]

Respondent argues strenuously that the mere fact that defense counsel employed an identifiable strategy in entering the unredacted records is sufficient to immunize that decision under Strickland.  (See Resp. Post-Hearing Mem. (Docket Entry # 22) 17-18.)  Strickland, however, requires more out of attorneys than deliberate action – it requires attorneys to behave "reasonab[ly] considering all the circumstances."  Rompilla v. Beard, 545 U.S. 374, 394 (2005); see also Wood v. Allen, 130 S. Ct. 841, 851 (2010) (counsel's decision must be a "reasonable exercise of professional judgment" to comply with Strickland).  Implicit in Strickland's reasonableness requirement is the requirement that counsel not embark on illegitimate or irrational courses of action.  In this case, given all the circumstances, it was not a reasonable exercise of counsel's professional judgment to enter an unredacted copy of the medical records into evidence.  Moreover, given the highly damaging nature of the unredacted portions and the absence of any meaningful justification for counsel's actions, it was unreasonable for the state court to conclude that defense counsel's decision to submit the unredacted records into evidence did not constitute deficient performance under Strickland.

> 3.      "Curing" the Alleged Defect in the Prosecution's Case

Usher claims that the prosecution failed to prove that the alleged course of sexual abuse lasted for three or more months, as required by N.Y. Penal Law § 130.75(1)(a), and that defense

---

[10] Respondent suggests – and, with some coaxing, got defense counsel to agree at the Habeas Hearing – that the excludable portions of the Ramirez Report were valuable because they showed, inter alia, that Fatima had been referred for a psychiatric examination, that her mother was evasive and refused to answer questions (which would allegedly support counsel's theory that Fatima was trained to make false allegations), and that Fatima had not disclosed the full extent of the alleged abuse to her mother or the police.  (HT 93-95.)  Counsel did not point out these facts to the jury at any point during the trial, and did not elaborate on their value at the Habeas Hearing.  The list of possible justifications compiled by respondent "resembles more a post-hoc rationalization of counsel's conduct than an accurate description of [his] deliberations" prior to trial.  Wiggins, 539 U.S. at 526-527.

counsel cured this defect by introducing the Ramirez Report and eliciting testimony from Fatima that the abuse began in July 2000.

On the witness stand, Dr. Ramirez opined that, based on the state of healing she observed during her physical examination of Fatima's vagina, Fatima was last sexually abused in mid-November of 2000.  (TT 626-27.)  The prosecution was therefore required to prove that the alleged abuse began on or before mid-August of 2000.  It is a close question whether there was sufficient testimony in the trial transcript for a rational trier of fact to conclude that the alleged abuse began prior to mid-August.  However, in the Ramirez Report interview notes, which were introduced into evidence by the defense, Fatima clearly stated that Usher digitally penetrated her vagina for the first time "after my birthday" on July 25, 2000.  (Ramirez Report at 4.)  This evidence was plainly sufficient to establish the durational element of the charge.  As discussed above, Fatima's statements regarding the duration and frequency of the alleged abuse were admissible under New York law, and the prosecution could have introduced them at any time.  Defense counsel's decision to admit them into evidence therefore was not per se deficient conduct.

4.     Eliciting and Failing to Object to Laguerre's "Outcry" Testimony

Usher alleges that defense counsel erred by opening the door for Laguerre to offer testimony outside the scope of the court's "prompt outcry" ruling and by failing to object to subsequent testimony that exceeded the scope of cross-examination.  This testimony was damaging because it was consistent with – and in some cases augmented – Fatima's later testimony.  According to Usher, defense counsel's elicitation of the "outcry" testimony from Laguerre also obviated the need for the prosecution to call Lugenia Reed, an acknowledged drug addict who had lost custody of Fatima and was therefore presumably impeachable.

As detailed above, the court ruled in limine that any "prompt outcry" testimony would be limited to the four to six words Fatima uttered at the moment she first informed Lugenia Reed that Usher had abused her. (TT 71-72.) According to the prosecution's offer of proof, those words were, "Daddy touched me on my cooty." (Id. at 70.) At trial, defense counsel's questions to Laguerre about Fatima's November 17 phone statements opened the door for the prosecution to elicit details of the allegations far beyond Fatima's initial statement that Usher had touched her vagina. (Id. at 469-71, 473-74.) Laguerre testified that Fatima told her on November 17, 2000 that Usher had "touched her on her cooty" and "put his . . . peanuts" in Fatima's "cooty," "butt," and mouth.[11] (Id. at 474.) Laguerre also explained that Fatima referred to her vagina as her "cooty" and to male genitalia as "peanuts." (Id.)

Immediately following this testimony, the prosecution asked Laguerre a series of questions about statements that Fatima had made at other times – that is, after the initial outcry on November 17. (Id.) Laguerre testified that Fatima told her that Usher and Fatima had played a game called "mommy and daddy," involving open-mouthed kissing followed by sexual intercourse. (Id. at 474-75.) Laguerre also stated that Fatima referred to Vaseline as "grease." (Id. at 475.) Defense counsel did not object to this questioning or testimony; instead, the court ordered a bench conference on its own initiative, after which the prosecution stopped questioning Laguerre about Fatima's allegations. (Id.)

At the Habeas Hearing, defense counsel testified that his decision to question Laguerre about Fatima's November 17 phone call was part of a deliberate strategy to call attention to the fact Fatima was not taken for a medical examination until six weeks after she first reported the alleged abuse. (HT 96-97; see also TT 678 (defense counsel's statements on summation that

_____
[11] Defense counsel made a general objection when the prosecution began asking Laguerre about Fatima's allegations on November 17; this objection was overruled. (TT 474.)

Lugenia Reed and Laguerre "wait[ed] six weeks to bring the kid in").) According to counsel, the fact that Lugenia Reed and Laguerre did not act promptly to seek treatment was meant to suggest to the jury that Fatima's allegations were exaggerated or false. There are numerous problems with this theory: for example, it does not explain why defense counsel felt the need to elicit testimony about the November 17 phone call beyond the fact of its occurrence. Moreover, it was clear from the prosecution's in limine offer of proof that Lugenia Reed was going to testify about the outcry, and that the fact that Fatima made her allegations for the first time on November 17 would therefore come out at trial. Nonetheless, this court cannot conclude that counsel's strategy was so unreasoned or ineffectual that the state court could not reasonably conclude that it complied with Strickland. Accord Singleton v. Davis, 308 Fed. Appx. 560, 562 (2d Cir. 2009) (unpublished opinion) (not unreasonable for state court to determine that counsel's conduct did not violate Strickland where counsel's failure to object to the admission of hearsay and decision to elicit it in one instance was part of a strategy to highlight perceived inconsistency between testimonial and physical evidence).

Defense counsel's failure to object to Laguerre's testimony about allegations that Fatima made after November 17, however, is harder to explain or defend. This hearsay testimony was hugely prejudicial and clearly exceeded the scope of both the court's outcry ruling and defense counsel's cross-examination. It is difficult to imagine a considered strategy that would incorporate or countenance such damaging evidence, and neither respondent nor defense counsel has offered an explanation for counsel's failure to object to it. This court cannot conclude – and the state court could not have reasonably concluded – that counsel's inaction in this regard was a "reasonable exercise of professional judgment." Wood, 130 S. Ct. at 851.

### D. Prejudice

To establish prejudice under <u>Strickland</u>, Usher must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id.</u>

The Second Circuit has consistently found prejudice and ordered habeas relief in child sex-abuse cases where the petitioner demonstrates (1) that defense counsel failed to consult or call an expert, and (2) that this failure deprived the petitioner of an opportunity to undermine either the physical evidence in the case or the prosecution expert's testimony.[12] <u>See</u> <u>Pavel</u>, 26 F.3d at 227-28; <u>Lindstadt</u>, 239 F.3d at 204-05; <u>Gersten</u>, 426 F.3d at 611-14. <u>Gersten</u> is the most recent and comprehensive of these cases, and is particularly significant because its facts are uncannily similar to those here.

In <u>Gersten</u>, petitioner was charged with multiple crimes for allegedly sexually abusing his daughter over a period of years between the ages of five and thirteen. At trial, the prosecution called five witnesses: the alleged victim, who was the only eyewitness apart from petitioner; the alleged victim's mother; the alleged victim's ex-boyfriend; a medical expert who had examined the complainant after the revelation of the alleged abuse; and Dr. Lewittes, who testified (as he did in Usher's case) about Child Sexual Abuse Accommodation Syndrome. <u>Id.</u> at 591. Defense counsel did not consult or call a medical expert and put on no evidence, and petitioner was

---

[12] The Second Circuit has also found ineffectiveness based in part on defense counsel's failure to consult or call an expert to challenge a psychology expert's testimony about "child sexual abuse syndrome." <u>See</u> <u>Eze</u>, 321 F.3d at 131-33. In this case, Usher's attorney failed to consult or call an expert who could challenge Dr. Lewittes's testimony about Child Sexual Abuse Accommodation Syndrome. Usher does not challenge that failure in his habeas petition, however. Because Usher did not raise this claim in any of his state court proceedings, AEDPA's exhaustion requirement prevents this court from considering it <u>sua sponte</u> here. <u>See</u> 28 U.S.C. § 2254(b)(1); <u>Jimenez v. Walker</u>, 458 F.3d 130, 148-49 (2d Cir. 2006) (claim must be "fairly presented" to state courts to be cognizable on habeas).

convicted. Id. The Second Circuit held that defense counsel's failure to consult a medical expert was both deficient and prejudicial, and that the state court's opinion to the contrary was an unreasonable application of Strickland. Id. at 614.

Two considerations animate the Gersten decision. First, the court assigned great significance to an affidavit prepared by petitioner's medical expert that directly contradicted the prosecution expert's analysis of the physical evidence. Id. at 599-601, 611-12. This affidavit concluded, in essence, that "the prosecution's physical evidence was not indicative of sexual penetration and provided no corroboration whatsoever of the alleged victim's story." Id. at 608. Second, in two passages that apply directly to Usher's case, the court explained the prejudicial consequences of a failure to conduct medical investigations in a child sex-abuse case where the alleged victim is the only direct witness.

> [I]t must be noted that the prosecution's entire case rested on the credibility of the alleged victim. All other evidence presented by the prosecution was indirect evidence offered to corroborate aspects of the alleged victim's story. Defense counsel's failure to investigate the prosecution's evidence led him to decide not to challenge what was clearly the most significant corroborative evidence – the medical expert testimony that the physical condition of the alleged victim supported a conclusion that penetration had taken place. Counsel's decision not to consult with or call an expert precluded counsel from offering a potentially persuasive affirmative argument that the alleged victim's condition was not indicative of or consistent with forced sexual penetration.
> . . . .
> Not only was the evidence against petitioner relatively thin, but most of it could have been, but was not, effectively challenged by defense experts or an informed cross-examination. The victim's credibility, the psychological expert's bolstering, and the medical expert testimony concluding that penetration had taken place, all could have been seriously undermined had petitioner's counsel offered the expert testimony that was available but that he failed to discover. As noted, where the record evidence in support of a guilty verdict is thin, as it is here, there is more likely to be prejudice. This is even more true where counsel's failures go to something as important as the medical evidence in this case – the only objective evidence that a crime occurred and the only evidence directly corroborating any aspect of the victim's story.

Id. at 612, 613-14 (citations omitted).

In this case, the Taff Affidavit is analogous to the petitioner's expert affidavit in <u>Gersten</u> in that it rebuts the key findings in Dr. Ramirez's testimony and the Ramirez Report. Dr. Ramirez based her conclusion that Fatima had been sexually abused on five pieces of evidence: (1) her interview with Fatima; (2) her measurement of Fatima's hymenal opening; (3) the "notch" in Fatima's hymen; (4) her observation that Fatima's fossa navicular was "ill defined and flattened" and that Fatima's posterior fourchette "felt like it was thinned out"; and (5) her observation that Fatima's hymenal rim was thin or "attenuated." (<u>See</u> TT 620-31; Ramirez Report at 16.) The Taff Affidavit states that: (1) Dr. Ramirez's prior interview of Fatima may have "colored" her interpretation of the physical examination; (2) the measurements that Dr. Ramirez took of Fatima's hymenal opening were imprecise and not indicative of abuse; (3) the "notch" could have been the result of abnormality rather than trauma, and, either way, it was impossible to determine when the "notch" was caused; and (4) Dr. Ramirez's descriptions of Fatima's fossa navicular and posterior fourchette were too vague and unscientific to support the conclusion that Fatima had been abused.[13] (Taff Aff. at ¶¶ 3-9.) Although this testimony may not have been quite as devastating to the prosecution's case as the affidavit in <u>Gersten</u>, its presence at trial would certainly have gone a long way towards undermining the corroborative physical evidence. Moreover, competent counsel would have discovered the medical articles identified by petitioner's counsel, which support Dr. Taff's conclusions that the diameter of Fatima's hymenal opening was not indicative of abuse, <u>see</u> Habeas Pet. Exs. J, K, and that Dr. Ramirez should have used illumination, magnification, and a colposcope to make accurate measurements, <u>see</u> Habeas Pet Ex. I.

---

[13] The Taff Affidavit does not discuss the thinning or "attenuation" of the hymenal rim that Dr. Ramirez cited to support her finding of abuse.

In this case, as in <u>Gersten</u>, the prejudicial effect of counsel's errors is magnified by the fact that the State's case against Usher was relatively weak. <u>See</u> <u>Strickland</u>, 466 U.S. at 696 ("[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by [counsel's] errors"). The only direct witnesses to the alleged abuse were the victim and the perpetrator. The only witnesses offered to corroborate the victim's account were Laguerre (who could testify only to what the victim had told her) and Dr. Ramirez. The testimony of Dr. Ramirez and the only physical evidence in the case could each have been undermined by contemporaneous medical literature and informed expert testimony. <u>See</u> <u>Lindstadt</u>, 239 F.3d at 204-05 (prosecution's case "underwhelming" where alleged sexual abuse victim and alleged perpetrator were only people with direct knowledge of abuse, only corroborative witnesses were the individual who victim first complained to and an examining physician, and the examining physician's conclusions could have been rebutted by existing medical literature or a medical expert); <u>Pavel</u>, 261 F.3d at 223-25, 226 (prosecution's sex-abuse case "weak" where it was essentially a "credibility contest" between the complainant and alleged perpetrator, and expert testimony could have undermined the physical evidence and the prosecution expert's testimony). Here, as in <u>Gersten</u>,

> other than the prosecution's questionable medical expert testimony, the prosecution offered no objective evidence to support an inference that any crime took place at all, and presented no physical evidence linking petitioner to any crime that occurred. No semen or other bodily fluids were recovered that could be connected to petitioner. Rather, all of the prosecution's evidence, with the exception of the alleged victim's testimony and the prosecution's questionable medical expert testimony – such as the mother's testimony about the victim's emotional outburst on revealing the abuse, and the psychological expert's explanation of the victim's delay and lack of detailed memory – was only indirectly and weakly corroborative of the victim's story or was offered to bolster her credibility.

<u>Gersten</u>, 426 F.3d at 613.

41

Counsel's additional errors further undermine confidence in Usher's guilty verdict. By entering an unredacted copy of the medical records and permitting Laguerre to testify about Fatima's statements after November 17, defense counsel unnecessarily permitted the jury to read and hear provocative, highly damaging hearsay statements. The notes of Fatima's interview bolstered her allegations and eventual testimony with detailed descriptions of the nature and timing of the abuse, contained irrelevant contextual details that fleshed out Fatima's narrative and were likely to evoke sympathy for her (or enmity towards Usher), and repeatedly identified Roy Usher as the culprit. Similarly, Laguerre's inflammatory hearsay testimony about the "mommy-daddy game" not only bolstered but augmented Fatima's testimony, and could not have failed to evoke disgust in the jurors. While these errors might not be sufficient on their own to establish prejudice, together with counsel's failure to consult a medical expert and the paucity of the State's evidence they raise serious doubts about the outcome of Usher's trial.

Given the gravity of counsel's errors and the weakness of the prosecution's evidence, it is clear that, on the facts of this case and as a matter of Second Circuit law, the state court could not reasonably conclude that Usher received effective assistance of counsel. Usher has demonstrated that his attorney's performance at trial fell "outside the wide range of professionally competent assistance" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 690, 694. These errors were so egregious, and their prejudicial effect so great, that the state court's determination that counsel did not violate Strickland was an "unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." 21 U.S.C. § 2254(d)(1).

**III.** **CONCLUSION**

For the reasons stated above, this court conditionally GRANTS Roy Usher's petition for a writ of habeas corpus.  See Hilton v. Braunskill, 481 U.S. 770, 775 (1987); Lindstadt, 239 F.3d at 206.  The State of New York shall release Usher unless it provides him with a new trial within 90 days of this order.

SO ORDERED.

 /s/ Nicholas G. Garaufis    
Dated: Brooklyn, New York                NICHOLAS G. GARAUFIS
     May 4, 2010                United States District Judge